You're welcome to sit in the front row because we won't call on you, don't worry about that. So there are seats in the front row. I think you're back in school. May it please the Court. Good morning, Counsel. Nell Brown for the petitioner, Mr. Berliner in this case. I'd like to start by clarifying a couple factual matters that I think are a little bit muddied by the briefing in this case. At page 13 and 14 of the State's brief where they're discussing that the attorney is concerned about the potential range of dissipation rates and says of which counsel was aware and then suggests that the number .25 could be the dissipation rate in this case and that that would be a problem. That's somewhat of a red herring. The .25 number is not relevant to this case. The range the State talks about is the range across the population. So for the entire universe of people, the range could be anywhere from .01 to .25. For an individual like Mr. Berliner in this case on this day, he would have one number, a rate which was .01. Is that in the record? That is in the record in a way. That is in case law. The McNeely case by the Supreme Court explains that, that an individual's rate steadily and gradually reduces over time and that it dissipates from the time they stop drinking until all the alcohol has left their body. That's a generally accepted proposition, but how about the specifics, the rate of dissipation? Is that something that's in the record? Because the lawyer suggested that in talking to the expert, that he felt that the dissipation rate could help or hurt his client, and since that was inconsistent with his main defense, he decided not to go that route. Right, and I think that that statement by counsel shows that counsel did not ask his expert about the forensic draw evidence. So the record shows that, excerpt of record page 50, counsel showed Grimsboe, who was his expert, the medical records. So he says on page 139 and 140 that he's not aware of the forensic draws and that what he was trying to refute with Grimsboe was the hospital draw. His entire focus and the way his testimony needs to be read is that he had only discussed the hospital draws with Grimsboe and that he was making his conclusions about dissipation rates only based on the hospital draws. We know that had he actually educated himself about the two forensic draws, he would have had a lot of different information. He would have specifically known his client's dissipation rate was .01. That number could have been discerned from doing a mathematical calculation from those two forensic draws at, you know, a few hours later in the evening that night. But where in the records is established that? I mean, I know it's been repeated in the briefs, and you say it again, but where is somebody putting in the record that we could say for a fact that it's within this range or it's specifically a dissipation rate? Well, there's obviously an exhibit in the PCR record that's not part of this record that does say that. It's just a mathematical fact. And if this attorney had educated himself about this information, he would have known this. It's clear from his testimony that he didn't ask his expert the right information. I thought he testified he did talk to his expert about dissipation rates and did not want to go down that route because it felt it may hurt him having discussed it with the expert. Yeah. That testimony needs to be, can only be understood to say he talked about the hospital draws with his expert because if he had talked about the other two draws with his expert, he would have had more information. He would have known that his own client's dissipation rate was not the high end of the range, as the briefing suggests, but it was the low end of the range. That's quite a few jumps beyond his testimony. He was worried about the dissipation rates, as Judge Huck says. But you're saying, well, in your view, if he understood them more, then he would have asked X and then he would have been advised Y and then he might have done Z. But that seems like a fairly attenuated, ineffective foundation. With respect, I disagree. This is a case about failing to investigate. So the attorney didn't look at all of the evidence in this case appropriately from the beginning. He never gave his expert all of the discovery in the case. He only gave the expert the medical records. So Grimsboe's opinion and advice to counsel about dissipation rates is only as good as the information he's given. He doesn't know that there are two forensic draws. You can see that the trial judge is, over the course of 40 or 50 pages, is in a tortured way trying to get this trial attorney to talk about the forensic draws because that was the key to making Grimsboe's opinion that the hospital draw was to be discounted by 15 percent. That was what was going to make it relevant if counsel for the defense was bringing in the forensic draws. Counsel didn't even think about those draws. For 50 pages, the trial judge asks him, did you research this? And the trial attorney says, no, I feel obtuse. I don't know what you're talking about. And everyone else in the room understood what he was talking about was, if you introduce these two forensic draws, that will make your expert's opinion relevant. He would have been able to get Grimsboe's opinion on the discount of the hospital draw in. But it also would have done more than that. It would have cast doubt on the hospital draw because if you extrapolate backwards, the hospital draw number seems to be an outlier. How would this all have been prejudicial? Why is this likely to have resulted in a ñ reasonably likely to have resulted in a different outcome? I think that ñ well, because this ñ there was no need. The prosecution's theory of their case just wasn't the alcohol. Correct. And the only evidence in there ñ that's another point that I wanted to clarify. The main defense was that he wasn't driving. That is his main defense, but the state was also introducing blood alcohol content evidence in order to show that he was acting with reckless intent, which was the most important element on the most serious charge, manslaughter. So when the state comes forward with blood alcohol content evidence to say that your client is intoxicated, and that goes to the most serious offense, and you have available forensic draws done by the Oregon State Police at the state crime lab where it's tested using the gold standard, and those results exculpate your client, you're obligated to meet the government's evidence with that. Well, he testified, though. He testified that that evening he had been not only drinking beer, but he'd been smoking marijuana. Absolutely. And that's the only ñ Impaired. Impaired. Correct. He said he was impaired. You're absolutely correct. Had counsel understood the value of this exculpatory evidence, he would never have had his client testify. How do we know that? His client had a right to remain silent. How is he going to establish that he wasn't driving the car? Well, there was other evidence that he wasn't driving. So the state says in its brief that his testimony was necessary to his defense. It wasn't. Strom, the passenger who was in the back seat of the car, testified that Mr. Berliner was the passenger in the front seat, that he was not driving. Other witnesses at the party, the one that comes to mind, his last name is Main, testified that Mr. Berliner wasn't driving. So the defense that he was not driving could have been established whether or not he testified. They could have brought that forward. But his testimony adds to that. It sounds to me like a fairly strong case of not driving the car. And to fight the issue of blood alcohol content seems to be inconsistent with that because I'm assuming the theory was I wasn't driving the car because I knew I was impaired. So they seem inconsistent. I don't think that the theory was I wasn't driving the car because I wasn't impaired. The way the facts are, someone else had already jumped in the car and said he was driving, and so Mr. Berliner just jumps in the passenger seat, which is something that regularly occurs with this off-roading vehicle. So I don't think he's saying I wasn't driving because I was too impaired to drive. He's saying I simply wasn't driving. I also wouldn't have testified had my attorney brought forward this evidence that showed I was not intoxicated. Do you want to save your remaining time? I would like to, yes. Thank you. May it please the Court, Counsel. Joanna Hershey on behalf of the Respondent, Brian Gears. The issue in this case is whether the post-conviction court reasonably applied the Strickland standard in rejecting Petitioner's post-conviction petition. And our position is that if you look at the main circumstances of this case, the post-conviction court's ruling was reasonable. The three main circumstances I want to focus on are, first, that Petitioner's primary defense, as you noted, was that he had not been driving the car at the time of the crash. Second, there was evidence that Petitioner had already admitted to police and paramedics numerous times that he had been drinking before the crash and evidence that he showed signs of intoxication at that time. Where does the 10 cups of beer come from? That comes from his own testimony at trial. Okay. The testimony... Testimony at trial, but not to the officers. No, the testimony to the officer was that he had been drinking, I think more generally. And then the third circumstance that I want the Court to focus on is the fact that the State did not present a per se theory of intoxication for any of the charges in this case. The State's theory was that defendant was intoxicated to a noticeable or perceptible degree. So the precise blood alcohol content number, although it's relevant, it was not the sort of the linchpin of the State's case. And I also want to start with clarifying some of the factual matters that were discussed. There is absolutely no evidence in the post-conviction record that defendants had a .01% per hour dissipation rate. There is no evidence from an expert that the rate is steady throughout time. What we have is a bit of conjecture from post-conviction counsel and Petitioner himself. They don't even agree about what they think his dissipation rate is. And the post-conviction court noted this in its decision, that there is simply this record, he said, this record is cold on the dissipation rate issue. The one piece of evidence that has any sort of scientific, potentially scientific merit, was not admitted at the PCR trial. It is not part of the evidentiary record, and under a Cullen v. Pinholster, it is not before this Court. And then another thing I'd like to point out is that the primary crux of this case, from Petitioner's perspective, is that there was a failure to investigate. But again, there is no proof that counsel did not investigate the whole blood test results or talk to his expert about that. On that subject, under the Strickland analysis, your position, I assume, is that defense counsel made legitimate reason defense theory. Yes. The counsel for the appellant says he was basically clueless. I don't know if she used that word, but suggested that, that he didn't even know of the existence of the forensic draws. I disagree with that as a factual reading of the record. And I think counsel was pointing to some statements made by trial counsel during a deposition. But we also have testimony from trial counsel at the post-conviction trial itself. And there's three questions from the petitioner himself that bear on this. He asks, did you look at the crime lab results? And counsel says, yes. Those are the whole blood test results. He asks, were you aware that with dissipation it puts my blood alcohol content at .35? And counsel responds, I don't necessarily agree with that. Certainly my expert didn't suggest that as a possibility. And I'm not certain that's actually correct. I don't think the dissipation rate has been established. And then the third question, isn't that something you should have discussed with your client? And counsel answers, I discussed it with the expert. So there is absolutely evidence in the record to support the post-conviction's implicit finding that counsel did make a reasoned investigation into that and chose after speaking with his expert not to pursue that avenue. And I think beyond the fact that it's our position that counsel acted reasonably in preparing his defense, which primarily did not revolve around attacking the state's blood alcohol evidence, there's really a failure to prove any prejudice in this case. That's what the district court found, and I think that's where this court's analysis really should start and end. Counsel made a number of arguments about prejudice. I want to just briefly mention that I think two of those arguments are not properly before this court. Those are that admitting the whole blood results would have helped counsel move to exclude the plasma results. And the second is that they would have helped counsel lay a proper foundation for the expert testimony that he ultimately was unable to present. This is the first time those arguments have ever been fleshed out in any way. The post-conviction court certainly didn't consider those in rendering its decision, and there's no record development about those. So our position is that they're procedurally barred, which leaves the other two prejudice arguments. And I want to start with the one that Petitioner says he would not have testified at trial had he known about this whole blood test results. The post-conviction court explicitly rejected that contention. The court found that counsel's statements at post-conviction that he absolutely would have had Petitioner testify and that Petitioner was going to testify no matter what, the post-conviction court credited that, and the court found real concern with Petitioner's credibility because his sort of excuse kept changing. At one time he said he wouldn't testify at all, and at another time he said he would have testified that he was not intoxicated. And I understand that counsel put on other evidence to show that the defendant was not the driver, but without defendant's testimony to support that, I think that defense would have been far weaker. And one of the key facts that the defendant testified to was that he often leaves his car keys in his car and allows his friends to drive it frequently, and that's really important to support a defense that he wasn't driving at the time of the accident because without that it sort of leaves the jury to speculate, well, how did this happen? It was clearly his car. How was somebody else sitting in the driver's seat? And then the remaining prejudice argument sort of rests on counsel's opinion that the whole blood test results were somehow exculpatory and that counsel failed to acknowledge the exculpatory nature of the evidence. I don't think that there has been any evidence to establish that those whole blood test results are exculpatory. As we discussed, there is no real evidence about the dissipation rates of this defendant, which is why both parties on appeal are sort of citing to case law about the average range, which isn't even consistent within the case law, to be perfectly honest. And what we know from that case law is that it's more than just basic math. There are other factors to consider. Were there other drugs in the defendant's system? We know he admitted to smoking marijuana. Could that affect the dissipation rate? What about other medications, food? Is it really a steady dissipation rate throughout? And what about the defendant's drinking history? There are so many factors that we don't have in this record to be able to conclusively determine what that dissipation rate is, and so we don't even know if this evidence really is exculpatory in that sense. So for all those reasons, I think the post-conviction court correctly determined that not only was counsel reasonable, but petitioner failed to prove prejudice. And unless you have any other questions, I'd rest on my brief. Thank you. Thank you. Ms. Brown, did Ms. Hershey accurately quote or recite the testimony of defense counsel? I don't think so. There's an inaudible in the record. If you're talking about the part of the record where petitioner's asking his own attorney in the post-conviction trial, did you look at the crime lab results? The attorney says, yes, I was indiscernible. Lab test showed. That's all he says. So it's not clear if he's saying, I was aware of what the hospital lab test showed, or if he's saying, I was aware of the forensic draws. You can tell from what he continues to say that they could be totally talking about different things. There's two ships passing in the night where he's so unaware of the forensic draws and their relevance, which is clear from the way he presented himself in both the trial court and in his post-conviction deposition where he repeatedly says, I don't remember that stuff, I don't remember that stuff, that he's not necessarily on the same page. But the judge heard all of that and came to the conclusion that he was credible and that your client was not credible. How can we do anything differently? I don't think the judge found that the attorney was credible. He found harmless error because of the fact that the client, the attorney said he had to testify. And that's simply not borne out by the record. It is an unreasonable determination of the facts in light of the record to say that this defendant had to testify. I think we have that point in mind, so you may want to sum up as you've exceeded your time. I just point the court to the Johnson v. Baldwin case, which I didn't cite in my brief. I can provide it by a 28-J letter. It's a 1997 decision of this court. And in that case, the attorney failed to invest. Well, since counsel doesn't have, nor the court, have any benefit of that, so I don't think it helps to argue it. If you want to submit a 28-J letter, you're welcome to do that. Thank you. Case of Berliner v. Gears is submitted. Thank you for your arguments.
judges: McKeown, Paez, Huck